UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————

| | |
|---|---|
| EQUITY TRUST COMPANY, et al., | Case No. 17-12275-CV |
| Plaintiffs, | Honorable George Caram Steeh |
| v | **FIRST AMENDED COMPLAINT** |
| TIMOTHY JAMES KOPACKA, ROGER C. WADSWORTH et al. | |
| Defendant. | |

————————————————————/

| | |
|---|---|
| Daniel J. Broxup (P72868) | Raymond W. Henney (P35860) |
| Kimberly M. Large (P70698) | Adam M. Wenner (P75309) |
| Mika Meyers PLC | Honigman Miller Schwartz and Cohn LLP |
| Attorneys for the Plaintiffs | Attorneys for Defendants |
| 900 Monroe Avenue, NW | 2290 First National Building |
| Grand Rapids, MI 49503 | 660 Woodward Avenue |
| (616) 632-8000 | Detroit, Michigan 48226 |
| dbroxup@mikameyers.com | (313) 465-7000 |
| klarge@mikameyers.com | rhenney@honigman.com |
| | awenner@honigman.com |

————————————————————/

Equity Trust Company, Custodian FBO Danny J. Wrubel IRA ("Wrubel IRA"), Danny J. Wrubel, Teresa K. Wrubel, Marion Family Living Trust, by its trustee Josephine A. Marion ("Marion Trust"), Marion Irrevocable Trust, by its Trustee Teresa K. Wrubel ("Marion Irrevocable Trust"), Josephine A. Marion, by her Next Friend, Teresa K. Wrubel, Equity Trust Company, Custodian FBO Marilynn L. Peterson IRA ("Peterson IRA"), Marilynn L. Peterson Revocable Trust, by its trustee, Marilynn L. Peterson ("Peterson Trust"), Marilynn L. Peterson, Travis Peterson, Ferrario Family Revocable Trust, by its trustee, Julie, A. Ferrario ("Ferrario Trust"), Julie A. Ferrario, Julie Vipond, Karen Fell, and Equity Trust Company, state as follows for their

First Amended Complaint against Defendants Timothy James Kopacka, United Mortgage Trust ("UMT"), United Development Funding II, LP ("UDF II"), and United Development Funding III, LP ("UDF III"):

## JURISDICTION

1.     The Wrubel IRA is a self-directed IRA for the benefit of Danny J. Wrubel.

2.     Danny J. Wrubel is an individual who resides in Macomb County, Michigan.

3.     Teresa K. Wrubel is an individual who resides in Macomb County, Michigan.

4.     The Marion Trust has as its trustee Josephine A. Marion.

5.     Josephine A. Marion is an individual who resides in Macomb County, Michigan.

6.     The Marion Irrevocable Trust has as its trustee Teresa Wrubel.

7.     The Peterson IRA is a self-directed IRA for the benefit of Marilynn L. Peterson.

8.     Marilynn L. Peterson is an individual who resides in Macomb County, Michigan.

9.     The Peterson Trust has as its trustee Marilynn L. Peterson.

10.    Travis Peterson is an individual who resides in Macomb County, Michigan.

11.    The Ferrario Trust has as its trustee Julie A. Ferrario.

12.    Julie A. Ferrario is an individual who resides in Macomb County, Michigan.

13.    Julie Vipond is an individual who resides in Macomb County, Michigan.

14.    Karen Fell is an individual who resides in Macomb County, Michigan.

15.    At all relevant times, Defendant Timothy Kopacka conducted business as a financial advisor in Macomb County, Michigan.

16.    At all relevant times, Defendants UMT, UDF II, and UDF III conducted business in Macomb County, Michigan.

17.    The majority of the facts and circumstances underlying the claims in this case took place in Macomb County, Michigan.

18.     The amount in controversy with respect to each Plaintiff exceeds $25,000 exclusive of attorneys' fees, interest, and costs.

19.     The Court has jurisdiction under MCL 600.601.

20.     Venue is proper in this Court pursuant to MCL 600.621 and MCL 600.629.

## DEFENDANT TIM KOPACKA

21.     From 1984 to 1998, Defendant Timothy Kopacka ("Kopacka") was a registered representative and securities agent of various securities broker-dealer firms.

22.     In 1998, Kopacka was permanently barred from the securities brokerage industry by the National Association of Securities Dealers ("NASD") as a result of misconduct in connection with the sale of private placement investments.

23.     At all times relevant to Plaintiffs' claims, Kopacka owned and operated Grosse Point Financial, an unregistered investment advisor firm.

24.     Through Gross Pointe Financial, Kopacka provided investment advice to Plaintiffs and other investors despite not being registered as an investment advisor or investment advisor representative with either the Securities and Exchange Commission ("SEC") or Michigan securities regulators.

25.     From 2000 and 2009, Kopacka induced Plaintiffs to invest in unsuitable high-risk, illiquid investments, including United Mortgage Trust ("UMT"), United Development Funding II ("UDF II"), and United Development Funding III ("UDF III").

26.     From 1996 to 2000, or thereabouts, Kopacka was a direct or indirect owner of UMT, and a direct owner and operator of Mortgage Trust Advisors, Inc., which served as UMT's investment advisor and asset manager during that time.

27.    From 2001 to 2006, or thereabouts, Kopacka was a direct or indirect owner of UMT, and a direct owner and operator of UMT Advisors, Inc., which served as UMT's investment advisor and asset manager during that time.

28.    Since 2006, Kopacka has been a direct owner of UMT Holdings, Inc., which is the parent company of UMT's investment advisor and asset manager.

29.    In 2004, Kopacka was a direct or indirect owner, investment advisor, and/or asset manager of UDF II.

30.    Since at least 2006, Kopacka has been a direct and/or indirect owner of UDF III, and a direct owner of UMT Holdings, Inc., which is the parent company of UDF III's general partner and asset manager.

31.    In his communications with Plaintiffs, when he recommended that they purchase UMT, UDF II, and/or UDF III, Kopacka never disclosed that he was a direct or indirect owner, manager, and/or advisor of UMT, UDF II, or UDF III.

32.    In his communications with Plaintiffs, when he recommended that they purchase UMT, UDF II, and/or UDF III, Kopacka misrepresented the risk, liquidity, and other features of the investments and misrepresented that the investments were suitable for Plaintiffs.

33.    In his communications with Plaintiffs, when he recommended that they purchase UMT, UDF II, and/or UDF III, Kopacka failed to disclose to Plaintiffs that he was barred from the securities brokerage industry or that he was legally prohibited from providing Plaintiffs with investment advice.

**NON-PARTY KIM KAHALA KOPACKA**

34.    From 1999 to 2003, Kopacka's wife, Kim Kahala Kopacka, ("Ms. Kopacka"), was a registered representative and securities agent of Respondent D.H. Hill Securities.

35.     From 2003 to March 28, 2017, Ms. Kopacka was a registered representative and securities agent of Respondent IMS Securities.

36.     Ms. Kopacka is currently under investigation by the Financial Industry Regulatory Authority ("FINRA") in connection with her role in the fraud described herein.

37.     Ms. Kopacka has been named as a Respondent in an arbitration proceeding that was filed with FINRA Dispute Resolution on June 7, 2017.

## THE KOPACKAS' FRAUDULENT SCHEME

38.     Despite the fact that Kopacka was barred by NASD and not registered to provide investment advice, Kopacka and Gross Pointe Financial (a) operated out of Ms. Kopacka's office, a registered branch office of D.H. Hill Securities (between 1999 and 2003) and IMS Securities (between 2003 and the present), and (b) used letterhead indicating that Kopacka and Gross Pointe Financial were affiliated with D.H. Hill Securities (between 1999 and 2003) and IMS Securities (between 2003 and the present), all of which created the illusion that Kopacka was a legitimate investment professional.

39.     In order to consummate the transactions that Kopacka recommended to Plaintiffs, and to cleanse them of Kopacka's earlier unlawful involvement in recommending them, Ms. Kopacka helped Kopacka launder the transactions through D.H. Hill Securities (between 1999 and 2003) and IMS Securities (between 2003 and the present).

40.     The transactions were laundered through D.H. Hill Securities and IMS Securities under the pretense that Plaintiffs were clients of Ms. Kopacka or another designated representative of the firms, when in fact, none of the Plaintiffs had ever met or spoken to Ms. Kopacka or the other designated representatives.

## THE INVESTMENTS AT ISSUE

41.     At all relevant times, UMT has been a non-traded real estate investment trust, or "REIT," which purports to invest either directly or indirectly in subprime mortgages.

42.     UMT is not redeeming shares and has no specific plan for distributions or liquidation.

43.     UMT has been unable to produce financial statements for two years.

44.     UMT has not paid any dividends for more than a year.

45.     UMT's primary asset is recourse notes from distressed borrowers.

46.     UMT shares rarely trade in a secondary market, but when they do, they trade at pennies on the dollar in relation to their cost basis.

47.     At all relevant times, UDF II has been a non-traded real estate finance company, which purports to invest either directly or indirectly in subprime mortgages.

48.     At all relevant times, UDF III has been a non-traded real estate finance company, which purports to invest either directly or indirectly in subprime mortgages.

49.     The UDF companies have been unable to produce financial statements for two years.

50.     The UDF companies have not paid any dividends for more than a year.

51.     The UDF companies' primary assets are recourse notes from distressed borrowers.

52.     The UDF companies' shares rarely trade in a secondary market, but when they do, they trade at pennies on the dollar in relation to their cost basis.

53.     In February 2016, UDF III and its affiliate United Development Funding IV ("UDF IV") had their offices raided by the FBI following allegations that they are operating a Ponzi scheme.

54.     Subsequent to the FBI raid, the SEC issued "Wells" notices to UDF III and UDF IV, as well as to various individuals associated with those companies, stating its intention to bring enforcement actions against them.

55.     The UDF Ponzi scheme allegations include the allegation that UDF management was planning to use funds invested in UDF III and UDF IV to provide liquidity to earlier UDF investors, including UDF II investors.

56.     The shares of UMT and the limited partnership interests in UDF II and UDF III are securities.

57.     In or around the year 2000, Kopacka induced Plaintiff Josephine Marion (through the Marion Trust) to invest approximately $100,000 in UMT.

58.     On or about April 3, 2000, Kopacka induced Plaintiffs Danny and Teresa Wrubel to invest $5,000 in UMT.

59.     On or about October 27, 2000, Kopacka induced Plaintiff Danny Wrubel (through the Wrubel IRA) to invest $9,000 in UMT.

60.     On or about April 19, 2002, Kopacka induced Plaintiff Danny Wrubel (through the Wrubel IRA) to invest a further $1,200 in UMT.

61.     On or about January 1, 2001, Kopacka induced Plaintiff Julie Ferrario (through the Ferrario Trust) to invest $50,000 in UMT.

62.     On or about March 15, 2003, Kopacka induced Plaintiff Julie Ferrario (through the Ferrario Trust) to invest a further $14,000 in UMT.

63.     On or about August 24, 2004, Kopacka induced Plaintiff Marilynn L. Peterson (through the Peterson Trust) to invest $34,188 in UDF II.

64.     On or about September 22, 2004, Kopacka induced Plaintiff Marilynn L. Peterson (through the Peterson Trust) to invest a further $50,000 in UDF II.

65.     On or about December 16, 2004, Kopacka induced Plaintiff Marilynn L. Peterson (through the Peterson IRA) to invest a further $25,000 in UDF II.

66.     On or about September 29, 2005, Kopacka induced Plaintiff Marilynn L. Peterson (through the Peterson IRA) to invest a further $25,000 in UDF II.

67.     On or about November 2, 2004, Kopacka induced Plaintiff Ferrario (through the Ferrario Trust) to invest $15,000 in UDF II.

68.      On or about January 12, 2009, Kopacka induced Plaintiff Danny Wrubel (through the Wrubel IRA) to invest $4,500 in UDF III.

69.     On or about July 3, 2009, Kopacka induced Plaintiff Travis Peterson to invest $15,000 in UDF III.

70.     On information and belief, on or about the early 2000s, Kopacka induced Dr. W. Fraser Vipond (now deceased), a medical doctor and the then-spouse of Plaintiff Julie Vipond, to purchase shares of UMT for himself and for his employees' profit sharing plan.  On information and belief, the initial investments were in excess of $300,000.

71.     One of the persons affected by Kopacka's acts to induce Dr. Vipond to purchase shares of UMT for his employees' profit sharing plan was Plaintiff Karen Fell.  Ms. Fell was one of Dr. Vipond's employees, and, on information and belief, her initial investment in $20 UMT shares was approximately $75,000.

## ALLEGATIONS AS TO MARION PLAINTIFFS

72.     Josephine A. Marion and her later husband, John Marion, were referred to Respondent Kopacka by friends and colleagues of Dr. Marion.

73.     The first meeting between the Marions and Kopacka occurred in or around 2000 at the Marions' home in Macomb County.

74.     At the time of the first meeting, the Marions were close to retirement and had almost no experience with investing.

75.     During the first meeting, Kopacka told the Marions that he was an independent investment advisor and that he could help them with their investments.

76.     The Marions told Kopacka that they did not want to take any unnecessary risks with their savings, being so close to retirement, but that they would like to position themselves for some potential growth and income.

77.     Kopacka recommended that the Marions liquidate existing conservative and/or moderately conservative investments and invest a substantial portion of the proceeds in UMT and other high-risk, illiquid REITs, including Behringer, Icon, and Tier REITs.

78.     On the occasions when Kopacka wanted the Marions to sign documents relating to their investments, he came to their home, presented them with the papers, and told them where to sign without explaining to them what they were signing.

79.     Kopacka assured the Marions that UMT and the other investments he recommended for them were suitable investments for them in light of their conservative investment goals and low risk tolerance.

80.     Kopacka assured the Marions that they could trust him because he was an expert in investing, was looking out for their best interests, and was doing a great job for Dr. Marion's colleagues.

81.     The Marions followed Kopacka's recommendation by investing approximately $100,000 in UMT (through the Marion Trust), as well as tens of thousands of dollars in other unsuitable investments.

82.     In the ensuing years after they invested with UMT, the Marions had no idea what the value of their UMT investment was because they either did not receive statements from UMT, or because the statements they received contained unreliable, misleading valuation estimates that failed to account for the substantial risk of widespread defaults in the subprime mortgage sector.

83.     When the Marions contacted Kopacka's office to inquire about the status of their UMT investment, Kopacka or his colleague Beth Debouvre always told them that the investment was doing well and that they were making money.

84.     Kopacka also told the Marions that they should not pay any attention to their UMT statements because the statements were not reliable.

85.     Kopacka never provided the Marions with a prospectus for UMT or disclosed his affiliation with UMT.

86.     Kopacka never told the Marions that their money could be locked up in UMT for decades or that UMT was a high-risk investment.

87.     Kopacka never disclosed to the Marions that he had been barred from selling securities or that he was legally prohibited from providing them with investment advice.

88.     Kopacka never mentioned to the Marions that someone other than him, namely his wife, Ms. Kopacka, or Beth Debouvre, would be their financial advisor of record for purposes of their UMT investment.

89.     Josephine Marion discovered the material information that the Kopackas and Respondents had concealed from her and her late husband (including Kopacka's NASD bar,

unregistered investment advisor status, conflicts of interest, and the lack of suitability of the investment Kopacka recommended) after the UDF Ponzi scheme allegations made her son-in-law Danny Wrubel suspicious that something was wrong, prompting him to investigate the Kopackas and Respondents.

## ALLEGATIONS AS TO WRUBEL PLAINTIFFS

90.      At all relevant times, Plaintiffs Danny and Teresa Wrubel have been husband and wife.

91.      At all relevant times, Plaintiff Danny Wrubel has been a construction worker and Teresa Wrubel has been a teacher.

92.      The Wrubels were referred to Kopacka by Teresa Wrubel's mother, Josephine A. Marion.

93.      The first meeting between the Wrubels and Kopacka occurred in or around the fall of 2000 at the Wrubels' home in Macomb County.

94.      At the time of the first meeting, the Wrubels were newly-weds living in rented accommodation and had less than $50,000 in retirement savings.

95.      During the first meeting, Kopacka told the Wrubels that he was an independent investment advisor and that he could help them with their investments.

96.      The Wrubels told Kopacka that they wanted to grow their small nest egg, but that they did not want high-risk investments.

97.      The Wrubels also told Kopacka that they had very little experience with, or knowledge about, investing.

98.      Kopacka recommended that the Wrubels liquidate existing blue-chip investments and invest a substantial portion of the proceeds in UMT, and the remainder in other unsuitable high-risk, illiquid investments.

99.    Over the next two years, or thereabouts, the Wrubels followed Kopacka's recommendation by making several investments in UMT totaling $15,200, along with investments totaling around $10,000 in other unsuitable high-risk, illiquid investments.

100.    On or about January 12, 2009, Kopacka induced Plaintiff Danny Wrubel (through the Wrubel IRA) to invest a further $4,500 in UDF III.

101.    On the occasions when Kopacka wanted the Wrubels to sign documents relating to their investments, he came to their home, presented them with the papers, and told them where to sign without explaining to them what they were signing.

102.    Kopacka assured the Wrubels that UMT, UDF III, and the other unsuitable high-risk illiquid investments that he recommended were suitable investments for them in light of their investment goals and low risk tolerance.

103.    Kopacka assured the Wrubels that they could trust him because he was an expert in investing, was looking out for their best interests, and was doing a great job for Teresa Wrubel's parents.

104.    In the ensuing years after they invested in UMT and UDF III, the Wrubels had no idea what the value of their investments were because they either did not receive statements, the statements they did receive simply valued the investments at cost, or because the statements contained unreliable, misleading valuation estimates that failed to account for the substantial risk of widespread defaults in the subprime mortgage sector.

105.    Until recently, when the Wrubels contacted Kopacka's office to inquire about the status of their investments, Kopacka or his colleague Beth Debouvre always told them that their investments were doing well and that they were making money.

106.    Kopacka also told the Wrubels that they should not pay any attention to their statements because they were not reliable.

107.    Kopacka never provided the Wrubels with a prospectus for UMT or UDF III or disclosed his affiliation with UMT or UDF III.

108.    Kopacka never told the Wrubels that their money could be locked up in UMT and UDF III for decades or that UMT and UDF III were high-risk investments.

109.    Kopacka never disclosed to the Wrubels that he had been barred from selling securities or that he was legally prohibited from providing them with investment advice.

110.    Kopacka never mentioned to the Wrubels that someone other than him, namely his wife, Ms. Kopacka, or Beth Debouvre would be their financial advisor of record for purposes of the UMT and UDF III investments.

111.    In recent years, when the Wrubels have tried to inquire about their investments with Kopacka, Kopacka has generally avoided their calls.

112.    In one of their last communications with Kopacka, Kopacka told the Wrubels that there was no way he could get their money out of UMT, and that he could only get them out of UDF III if they would agree to accept pennies on the dollar in relation to their cost basis.

113.    The Wrubels had no communication with Kopacka for over a year before he abruptly appeared at their doorstep approximately six months ago trying to sell them life insurance.

114.    The Wrubels discovered the material information that Kopacka had concealed from them  (including his NASD bar, unregistered investment advisor status, conflicts of interest, and the lack of suitability of the investment he recommended) after the UDF Ponzi scheme allegations made them suspicious that something was wrong, prompting them to investigate Kopacka.

## ALLEGATIONS AS TO PETERSON PLAINTIFFS

115.    Plaintiff Marilynn Peterson and her then teenage son, Travis Peterson, met with Kopacka at Kopacka's office in Grosse Pointe in or around 2004.

116.    During the first meeting, Kopacka told the Petersons that he was an independent financial advisor and that he could help them with their investments.

117.    Marilynn Peterson told Kopacka that she was close to retirement, financially supporting her parents, and that she wanted to invest in something safe.

118.    Travis Peterson told Kopacka that he intended to use his savings to pay for educational expenses.

119.    The Petersons both told Kopacka that they were inexperienced when it came to investing.

120.    Kopacka recommended that the Petersons liquidate existing conservative investments and invest a substantial portion of the proceeds in UMT and UDF II, as well as other unsuitable illiquid, high-risk investments.

121.    Over the next year, or thereabouts, the Petersons both followed Kopacka's recommendation: Marilynn Peterson invested upwards of $130,000 in UMT and UDF II, and an additional $125,000 in Behringer, Inland Western, and Inland American REITs; Travis Peterson invested $75,000 in UMT.

122.    In 2006, during a meeting at Marilynn Peterson's home, Kopacka recommended that Travis Peterson invest $15,000 in UDF III and a total of $50,000 in NetREIT and Blackhawk REITs, which he subsequently did.

123.    On the occasions when Kopacka wanted the Petersons to sign documents relating to their investments, he often came to Ms. Peterson's house, or met the Petersons in a restaurant,

then presented them with the papers and told them where to sign without explaining to them what they were signing.

124.    Kopacka assured the Petersons that the UMT and UDF investments, along with the REITs he recommended, were suitable investments for them in light of their respective investment goals and risk tolerance.

125.    Kopacka assured the Petersons that they could trust him because he was an expert in investing, was looking out for their best interests, and had a terrific track record of success.

126.    In the ensuing years after they invested with UMT, the Petersons had no idea what the value of their UMT investments were because they never received statements.

127.    In the ensuing years after they invested with UDF II and UDF III, the Petersons received quarterly statements (although the UDF II statements stopped coming in 2015); however, the investment valuations in the statements were unreliable, misleading estimates which failed to take into account the likelihood of defaults in the subprime mortgage sector.

128.    Until recently, whenever the Petersons contacted Kopacka's office to inquire about the status of their investments, Kopacka's associate, Beth Debouvre, who was a registered representative of IMS Securities, always reassured the Petersons that their investments were doing well, and that they were making money.  Kopacka was almost never available to talk with the Petersons.

129.    Travis Peterson was able to recover some of his money by selling his UMT shares back to Kopacka, and by selling his UDF III investments on the secondary market at a steep discount; however, he still has upwards of $50,000 locked up in illiquid investments which he needs in order to pay his undergraduate and graduate school expenses.

130.    Kopacka never provided the Petersons with a prospectus for UMT or the UDF investments or disclosed his affiliation with UMT, UDF II, or UDF III.

131.    Kopacka never told the Petersons that their money could be locked up in the UMT and UDF investments for decades, or that the UMT and the UDF investments were high-risk investments.

132.    Kopacka never disclosed to the Petersons that he had been barred from selling securities, or that he was legally prohibited from providing them with investment advice.

133.    Kopacka never mentioned to the Petersons that someone other than him, namely his wife, Ms. Kopacka, or Beth Debouvre would be their financial advisor of record for purposes of the UMT and UDF investments.

134.    The Petersons did not discover that they might have claims against Kopacka until after the UDF Ponzi scheme allegations began to surface.

135.    Since discovering the material information that Kopacka concealed from her, Ms. Peterson has tried to contact Mr. Kopacka on several occasions, but each time, IMS representatives have told her that Kopacka is too busy "dealing with UDF" to talk to her.

## ALLEGATIONS AS TO FERRARIO PLAINTIFFS

136.    Julie Ferrario and her late husband, Edward Ferrario, were referred to Kopacka in or around 2001 by Teresa Wrubel after Ms. Ferrario told Ms. Wrubel that she was looking for someone to help her invest inheritance money.

137.    At that time of the referral, Ms. Ferrario was a teacher, Mr. Ferrario was a middle manager at DTE, and both were approaching retirement.

138.    At the initial meeting between Kopacka and the Ferrarios, which took place at the Ferrarios' home, Kopacka told the Ferrarios that he was an independent investment advisor and that he could help them with their investments.

139.    The Ferrarios told Kopacka that they were inexperienced investors and that their investment goals were simply to save for a modest retirement and to put their children through college.

140.    Kopacka recommended that the Ferrarios liquidate conservative and moderately conservative investments and invest a substantial portion of the proceeds in UMT.

141.    Over the next two years, or thereabouts, the Ferrarios followed Kopacka's recommendation by investing approximately $65,000 in UMT.

142.    In 2004, during a meeting at the Ferrarios' home, Kopacka recommended that the Ferrarios invest in UDF II, which they subsequently did, in the amount of $15,000.

143.    Kopacka assured the Ferrarios that UMT and UDF II were suitable investments for them in light of their investment goals and modest risk tolerance.

144.    Kopacka assured the Ferrarios that they could trust him because he was an expert in investing, was looking out for their best interests, and was doing a great job for Teresa Wrubel and her parents.

145.    On the occasions when Kopacka wanted the Ferrarios to sign documents, he usually met them at their home and told them where to sign, but never explained to them what they were signing.

146.    In the ensuing years after they invested in UMT and UDF II, the Ferrarios had no idea what the value of their investments were because they either did not receive statements, the statements they did receive simply valued the investments at cost, or because the statements contained unreliable, misleading valuations that failed to account for the substantial risk of widespread defaults in the subprime mortgage sector.

147.     Until recently, when Plaintiff Ferrario contacted Kopacka's office to inquire about the status of her investments, Kopacka or his colleague Beth Debouvre always told her that the investments were doing well and that she was making money.

148.     Kopacka also told the Ferrarios that they should not pay any attention to their statements because they were not reliable.

149.     Kopacka never provided the Ferrarios with a prospectus for UMT or UDF II, or disclosed his affiliation with UMT and UDF II.

150.     Kopacka never told the Ferrarios that their money could be locked up in UMT and UDF II for decades, or that UMT and UDF II were high-risk investments.

151.     Kopacka never disclosed to the Ferrarios that he had been barred from selling securities, or that he was legally prohibited from providing them with investment advice.

152.     Kopacka never mentioned to the Ferrarios that someone other than him, namely his wife, Ms. Kopacka, or Beth Debouvre would be their financial advisor of record for purposes of the UMT and UDF II investments.

153.     In recent years, when Ms. Ferrario has tried to inquire about her investments with Kopacka, Kopacka has avoided her calls.

154.     Ms. Ferrario discovered the material information that the Kopackas and Respondents had concealed from her  (including Kopacka's NASD bar, unregistered investment advisor status, conflicts of interest, and the lack of suitability of the investment Kopacka recommended) after the UDF Ponzi scheme allegations made her suspicious that something was wrong, which prompted her to investigate Kopacka.

### ALLEGATIONS AS TO VIPOND AND FELL PLAINTIFFS

155.     Plaintiff Julie Vipond is approximately 80 years old.

156.    At all times relevant hereto, Ms. Vipond was married to the late Dr. W. Fraser Vipond.

157.    Upon information and belief, Dr. Vipond met Kopacka in or around 2000, while Kopacka was soliciting sales of investments in UMT at the St. John's hospital.

158.    When he met Kopacka, Dr. Vipond was a medical doctor, specializing in ophthalmology, who had privileges at a number of area hospitals, including St. John Hospital.

159.    Upon information and belief, Kopacka told Dr. Vipond that he was an independent investment advisor and that he could help him with his investments.

160.    Dr. Vipond was not a sophisticated investor and communicated that information to Kopacka.

161.    Upon information and belief, Dr. Vipond conveyed to Kopacka that he wanted to invest in secure, low-risk investments.

162.    Upon information and belief, Dr. Vipond told Kopacka that he wanted to invest the assets of the profit sharing plan that he established for his employees in secure, low-risk investments.

163.    Kopacka induced Dr. Vipond to purchase UMT shares for himself and for the profit sharing plan.

164.    Upon information and belief, Dr. Vipond invested in excess of $300,000 of his own money in UMT.

165.    Upon information and belief, Kopacka assured Dr. Vipond that UMT and other unsuitable high-risk, illiquid investments that he recommended were suitable investments for him and for the profit sharing plan.

166.     Plaintiff Karen Fell was an employee of Dr. Vipond who participated in the profit sharing plan.

167.     Ms. Fell acquired over 5000 shares of UMT, which, upon information and belief, were purchased for approximately $75,000.

168.     Upon information and belief, in the ensuing years after they invested in UMT, Dr. Vipond and Plaintiff Fell had no idea what the value of their investments were because they either did not receive statements, the statements they did receive simply valued the investments at cost, or because the statements contained unreliable, misleading valuation estimates that failed to account for the substantial risk of widespread defaults in the subprime mortgage sector.

169.     Upon information and belief, based on the representations of Kopacka or his colleague Beth Debouvre, up until his death in 2016, Dr. Vipond believed that his UMT investments were performing well.

170.     Upon information and belief, based on the representations of Kopacka or his colleague Beth Debouvre, until recently, Plaintiff Fell believed that her UMT investments were performing well.

171.     Upon information and belief, Kopacka never provided Dr. Vipond or Plaintiff Fell with a prospectus for UMT and never disclosed to them that he was affiliated with UMT.

172.     Upon information and belief, Kopacka never told Dr. Vipond or Plaintiff Fell that their money could be locked up in UMT for decades or that UMT was a high-risk investment.

173.     Upon information and belief, Kopacka never disclosed to Dr. Vipond or Plaintiff Fell that he had been barred from selling securities or that he was legally prohibited from providing them with investment advice.

174.    Upon information and belief, Kopacka never mentioned to Dr. Vipond or Plaintiff Fell that someone other than him, namely his wife, Ms. Kopacka, or Beth Debouvre would be their financial advisor of record for purposes of the UMT investments.

175.    Upon Dr. Vipond's death in February 2016, the UMT shares in his name transferred to Plaintiff Julie Vipond.

176.    Ms. Vipond sold her UMT shares in February 2017 for $1.75 per share, and for a capital loss believed to be in excess of $300,000.

177.    Ms. Vipond and Ms. Fell recently learned about the material omissions set forth herein (including Kopacka's NASD bar, unregistered investment advisor status, conflicts of interest, and the lack of suitability of the investment Kopacka recommended) from Ms. Vipond's stepson, who investigated UMT following his father's death in 2016.

## COUNT I – FRAUD (TIMOTHY KOPACKA)

178.    Plaintiffs incorporate paragraphs 1 through 177 above as if fully restated herein.

179.    Through a series of intentional and material misrepresentations and omissions, including each of his representations and omissions described *supra*, Kopacka defrauded each of the Plaintiffs into investing in one or more of UMT, UDF II, and UDF III, as well as other high-risk, illiquid investments.

180.    The misrepresentations described *supra* were material and false.

181.    The omissions described *supra* were material and created a false impression.

182.    Kopacka knew that the misrepresentations described *supra* were false at the time he made them, or acted recklessly in making the representations, and without knowledge of the truth.

183.    Kopacka knew that the omissions described *supra* would create a false impression, or, alternatively, that the omissions were reckless.

184.    Kopacka intended for the fraudulent misrepresentations and omissions described *supra* to induce Plaintiffs to invest in UMT, UDF II, and UDF III, as well as other high-risk, illiquid investments.

185.    Plaintiffs would not have invested in UMT, UDF II, and UDF III, as well as other high-risk, illiquid investments that Kopacka recommended, but-for Kopacka's intentional and fraudulent misrepresentations and omissions described *supra*.

186.    As a direct and proximate result of Kopacka's fraud, Plaintiffs have each sustained compensatory and exemplary damages.

### COUNT II – BREACH OF FIDUCIARY DUTY (TIMOTHY KOPACKA)

187.    Plaintiffs incorporate by reference paragraphs 1 through 186 as though fully set forth herein.

188.    Kopacka owed fiduciary duties of honesty, loyalty, prudence, care, and disclosure to Plaintiffs.

189.    Through a series of misrepresentations and omissions, including each of the his representations and omissions described *supra*, Kopacka breached his fiduciary duties to Plaintiffs, causing each of the Plaintiffs to invest in one or more of UMT, UDF II, and UDF III, as well as other high-risk, illiquid investments.

190.    Kopacka breached his fiduciary duties to Plaintiffs by making imprudent and unsuitable investment recommendations to the Plaintiffs, which caused each of the Plaintiffs to invest in one or more of UMT, UDF II, and UDF III, as well as other high-risk, illiquid investments.

191.    Plaintiffs would not have made the unsuitable investments but-for Kopacka's fiduciary breaches.

192.     As a direct and proximate result of Kopacka's fiduciary breaches, Plaintiffs have each sustained compensatory and exemplary damages.

## COUNT III – NEGLIGENT MISREPRESENTATIONS / OMISSIONS
### (TIMOTHY KOPACKA)

193.     Plaintiffs incorporate by reference paragraphs 1 through 192 as though fully set forth herein.

194.     Kopacka owed Plaintiffs a duty of reasonable care in connection with the services he provided to them.

195.     Through a series of negligent misrepresentations and omissions, including each of his representations and omissions described *supra*, Kopacka breached his duty of care to Plaintiffs, causing each of the Plaintiffs to invest in one or more of UMT, UDF II, and UDF III, as well as other high-risk, illiquid investments.

196.     Kopacka breached his duty of care to Plaintiffs by making negligent investment recommendations to the Plaintiffs, which caused each of the Plaintiffs to invest in one or more of UMT, UDF II, and UDF III, as well as other high-risk, illiquid investments that were unsuitable for Plaintiffs.

197.     Plaintiffs would not have invested in the unsuitable investments but-for Kopacka's negligent misrepresentations, omissions, and recommendations described *supra*.

198.     As a direct and proximate result of Kopacka's negligence, Plaintiffs have each sustained compensatory and exemplary damages.

## COUNT IV – SECURITIES FRAUD UNDER SECTION 10(B) OF
## THE SECURITIES AND EXCHANGE ACT AND SEC RULE 10B-5
### (TIMOTHY KOPACKA)

199.     Plaintiffs incorporate paragraphs 1 through 198 as if stated in their entirety herein.

200.    Through a series of intentional and material misrepresentations and omissions, including each of his representations and omissions described *supra*, Kopacka defrauded each of the Plaintiffs into investing in one or more of UMT, UDF II, and UDF III, as well as other high-risk, illiquid investments.

201.    Kopacka's misrepresentations and omissions were undertaken with scienter because Kopacka's actions and decisions were made knowingly and with intent to deceive, manipulate, and defraud Plaintiffs.

202.    Kopacka's misrepresentations and omissions were undertaken with scienter because Kopacka's actions and decisions were made recklessly and with conscious disregard for the interest of Plaintiffs.

203.    Kopacka's misrepresentations and omissions were undertaken for the purposes of inducing Plaintiffs to purchase the investments at issue and were critical to Plaintiffs' decisions to purchase the investments at issue.

204.    Plaintiffs' relied on Kopacka's misrepresentations and omissions when deciding to follow Kopacka's investment recommendations.

205.    Kopacka was the direct and proximate cause of the losses that Plaintiffs have suffered because, but-for Kopacka, the Plaintiffs would not have invested in UMT, UDF II, or UDF III.

206.    As a direct and proximate result of Kopacka's securities fraud, Plaintiffs have each sustained compensatory and exemplary damages.

### COUNT V – AIDING AND ABETTING FRAUD
### AND BREACH OF FIDUCIARY DUTY (UMT, UDF II, and UDF III)

207.    Plaintiffs incorporate paragraphs 1 through 206 as if stated in their entirety herein.

208.     Defendant UMT, UDF II, and UDF III, knew or should have known that Kopacka operated an unregistered investment advisor firm, was legally prohibited from providing investment advice, was barred by the NASD, and that he was using his wife and the Respondent brokerage firms as conduits through which to unlawfully sell investments in UMT, UDF II, and UDF III.

209.     With full knowledge of the fraud that Kopacka was perpetrating on Claimants and/or the fiduciary breaches that Kopacka was committing, Defendants UMT, UDF II, and UDF III intentionally and substantially aided and abetted Kopacka in accomplishing his purpose.

210.     As a direct and proximate result of the actions and omissions of UMT, UDF II, and UDF III that aided and abetted Kopacka's fraud and fiduciary breaches, Claimants have each sustained compensatory and exemplary damages.

## COUNT VI – CIVIL RICO (ALL  DEFENDANTS)

211.     Plaintiffs incorporate paragraphs 1 through 210 as if stated in their entirety herein.

212.     Under 18 USC Section 1962(c) it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

213.      Defendant along with Kim Kahala Kopacka, Beth DeBouvre, IMS Securities, D.H. Hill Securities, Dan H. Hill, Kathy Wadsworth, Roger Wadsworth, UMT, UDF II, and UDF III (the "RICO Associates") are and were at all times mentioned herein "persons" as that term is defined in 18 USC Section 1961(3) and 1962(c).

214.     IMS Securities and D.H. Hill were Selling Group Managers with respect to the UMT and UDF investments that Defendant Kopacka induced Plaintiffs to purchase.

215.    Dan H. Hill was the owner and operator of D.H. Hill Securities, a business partner of Kopacka, and a direct or indirect owner, manager, and/or advisor of one or more of UMT, UDF II, and UDF III.

216.    Jackie and Roger Wadsworth were the owners and operators of IMS Securities and business associates of Kopacka, and Mr. Wadsworth was also a trustee of UMT.

217.    Beth DeBouvre was a registered agent of IMS Securities and a business associate of Kopacka who assisted him in the sale of UMT, UDF II, and UDF III investments.

218.    UMT, UDF II, UDF III, IMS Securities, D.H. Hill Securities, Dan H. Hill, Kim Kopacka, Beth DeBouvre, and Jackie and Roger Wadsworth knew that Kopacka operated an unregistered investment advisor firm, was legally prohibited from providing investment advice, was barred by the NASD, and used his wife, Ms. Kopacka, and other registered representatives of D.H. Hill Securities and IMS Securities as conduits through which to unlawfully sell shares of UMT and partnership interests in UDF II and UDF III to his clients.

219.    UMT, UDF II, UDF III, IMS Securities, D.H. Hill Securities, Dan H. Hill, Kim Kopacka, Beth DeBouvre, and Jackie and Roger Wadsworth acted knowingly and with fraudulent intent by allowing Kopacka to use his wife, Kim Kopacka, as well as Beth DeBouvre, and potentially other registered representatives of D.H. Hill Securities and IMS Securities as conduits through which to unlawfully sell shares of UMT and partnership interests in UDF II and UDF III to his clients.

220.    In order to facilitate Plaintiffs' investments and perpetrate their fraud against Plaintiffs, the RICO Associates arranged for Defendant Kopacka and/or his wife or Beth DeBouvre to send documentation and funds relating to Plaintiffs' investments, including but not limited

account opening forms, subscription agreements, and purchase funds, from Michigan to D.H. Hill Securities and IMS Securities in Texas using the mail and wires.

221.   In order to facilitate Plaintiffs' investments and perpetrate their fraud against Plaintiffs, the RICO Associates arranged for Defendant Kopacka and/or his wife or Beth DeBouvre to be furnished with UMT and UDF documentation, delivered through the mail or wires, including but not limited to account opening forms and subscription agreements, so that Kopacka could procure investments in UMT, UDF II and UDF III.

222.   Based on the foregoing, at all relevant times, the RICO Associates constituted an "enterprise" within the meaning of 18 USC Section 1961(4) and 1962(c), in that they were a group of individuals "associated in fact" who worked together to fraudulently cause Plaintiffs and other investors to purchase securities issued by companies that Kopacka, Hill, and the Wadsworths were associated with and had pecuniary interests in.

223.   The RICO Associates knowingly and willfully conducted and participated in the conduct of the RICO enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 USC Section 1962(c).

224.   At all times mentioned herein the racketeering enterprise, was engaged in, and its activities affected, interstate commerce and foreign commerce.

225.   Each of the Defendants derives income directly and indirectly, through their operation, management, association with or control of the enterprise.

226.   Each fraudulent investment transaction described *supra, w*hich took place between 2000 and 2009, is a separate predicate act of mail and wire fraud, and taken together, the predicate acts establish a pattern of racketeering activity within the meaning of 18 USC Section 1962(c).

227.    As a proximate result of the pattern of racketeering engaged in by Defendants and the other RICO Associates, Plaintiffs have sustained compensatory and exemplary damages.

### COUNT VII – CIVIL RICO CONSPIRACY (ALL  DEFENDANTS)

228.    Plaintiffs incorporate and reallege the allegations of paragraphs 1 through 227 as if fully set forth herein.

229.    The RICO Associates conspired to conduct or participate, directly or indirectly, in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity (as described in paragraphs *supra*) in violation of 18 USC Section 1962(d).

230.    As a direct and proximate result of, and by reason of, the activities of the RICO Associates, and their conduct in violation of 18 USC Section 1962(d), Plaintiffs have been injured within the meaning of 18 USC Section 1962(c).

### COUNT VIII – AGENCY

231.    Plaintiffs incorporate and reallege the allegations of paragraphs 1 through 230 as if fully set forth herein.

232.    Kopacka was an agent of the entity defendants acting within the scope of his agency when he sold the investments at issue to Plaintiffs, which makes the entity defendants derivatively liable for the damages caused by Kopacka's unlawful actions.

### PRAYER FOR RELIEF

Plaintiffs request that this Court (a) enter money judgments for each Plaintiff against Defendants, jointly and severally, in an amount to be determined consisting of compensatory and exemplary damages, treble damages under 18 USC 1964(c), and pre- and post-judgment interest, and (b) award Plaintiffs' their attorneys' fees and costs, together with such other relief as this Court deems equitable and just.

Respectfully submitted,

MIKA MEYERS PLC
Attorneys for Plaintiffs

Dated:  August 2, 2017          By:   /s/ Daniel J. Broxup
                                      Daniel J. Broxup (P72868)
                                      Mika Meyers PLC
                                      900 Monroe Avenue, NW
                                      Grand Rapids, MI 49503
                                      (616) 632-8000